UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| INDIAN LAND CAPITAL COMPANY, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> HIGHLAND PARK MANAGEMENT, LLC, and L. STEVEN HAYNES, <br><br> Defendants. | 5:21-CV-05015-KES <br><br> MEMORANDUM OPINION AND ORDER |

Beginning on October 28, 2025, the court held a three-day bench trial. Docket 92. Before the court were the fraud claims brought by plaintiff, Indian Land Capital Company, LLC (ILCC), against defendants, Highland Park Management (HPM), LLC, and L. Steven Haynes. *See* Docket 13 at 17. ILCC alleges that defendants made fraudulent misrepresentations during loan negotiations and that it relied on these misrepresentations in making a $1.5 million loan to defendants. *Id.* at 15-19. Both parties filed posttrial briefs. Dockets 99, 100, 101. Having considered the evidence, testimony, and the parties' arguments, the court issues the following order.

**FACTUAL FINDINGS**

After hearing all the testimony and reviewing all the exhibits, the court finds that the following facts were proven by the greater weight of the evidence:

ILCC is a Minnesota limited liability company that provides capital to Native American tribes and tribally owned entities throughout the United

States. Docket 98 at 8. ILCC's goal is to help tribes achieve greater sovereignty through economic development and land acquisition. *Id.* at 9. The Infrastructure Development Cooperative (IDC) was formed on December 29, 2014, by entities created by the Wakpamni Lake Community. Docket 98-1 at 12. The same day, Wakpamni Lake Community Propane Company joined IDC. *Id.* The Wakpamni Lake Community is a local subsidiary municipal government of the Oglala Sioux Tribe. *Id.* at 6.

In the spring of 2015, IDC entered into a management agreement with HPM, a company owned by Haynes that maintains its principal place of business in Dallas, Texas. Docket 94 at 62-85; Docket 98-2 at 4-5. Under the management agreement, HPM was engaged to "manage, operate, maintain, and service" a "propane distribution and leasing business" for IDC. Docket 94 at 62. Haynes is HPM's sole employee and served as its only representative in the events relevant to this case. Docket 98-2 at 3. The propane business was intended to provide affordable propane to various Native American tribes and tribal communities throughout Indian country. Docket 98-1 at 170-71, 173-74, 180.

The management agreement required HPM to employ "a sufficient number of capable employees to enable it to properly, adequately, and safely and economically manage, operate, maintain and account for [its] Management Services." Docket 94 at 64. HPM was responsible for preparing and submitting an annual plan for IDC's approval and for implementing the plan once approved. *Id.* at 65-66. In return, HPM was to receive a management fee of

2

$0.05 per gallon delivered. *Id.* at 76. This rate never changed. *See* Docket 98-1 at 185.

Gabe Doney was hired as IDC's Executive Director in March 2015. *Id.* at 14, 61. IDC intended to finance the propane venture by issuing revenue bonds. *Id.* at 37. Before the new bonds were issued, WLCC funded IDC's business venture from a previous bond issue. *Id.* at 174. Due to a late bond payment during the fall of 2015, *see id.* at 178, IDC sought a bridge loan to finance the propane project until IDC could obtain additional bond financing, *id.* at 193, 196.

In late 2015, Haynes contacted ILCC's CEO, Rjay Brunkow, and asked whether ILCC was interested in providing a loan guaranty. *Id.* at 195; Docket 98 at 12, 15. After reviewing the proposed guaranty, Brunkow informed Haynes that ILCC preferred to make the loan directly to IDC rather than serve as a guarantor for another lender's loan. Docket 98 at 15-16.

Haynes, who was Brunkow's primary contact regarding the loan, *id.* at 35, agreed to this arrangement and provided Brunkow with key information for ILCC to review and use in underwriting the loan, *id.* at 24. Haynes provided Brunkow with the "sources and uses" document, which described four specific uses for the loan proceeds: (1) the fee to ILCC, (2) propane purchases, (3) a $500,000 reserve account, and (4) storage tanks and delivery vehicle purchases. *Id.* at 20, 30; Docket 94 at 99.

Haynes also told Brunkow that the bonds anticipated to fund the project were fully subscribed and would be sold once Moody's issued its bond rating. Docket 98 at 36. Brunkow memorialized this representation in a summary he prepared for the ILCC board. *Id.* at 35-36; Docket 94 at 146.

Haynes additionally provided Brunkow with a one-page overview describing the propane project and purpose of the loan. *Id.* at 37-38; Docket 94 at 664. In that document, Haynes stated that "11 [tribes] signed letters of intent to join [IDC]. Four tribes have already adopted laws and joined, seven more are in process, and none of the 40 have said no." Docket 94 at 664. The document also represented that "[e]very day we add more tanks, more homes, and more businesses to the client base." *Id.* Haynes also reported that IDC purportedly owned five trailers and a truck, valuing them at $400,000. *Id.* at 101; Docket 98 at 28-29.

On February 2, 2016, ILCC and IDC executed a loan agreement and promissory note. Docket 94 at 86-98, 220-24; Docket 98 at 110. The note was due on August 31, 2017. Docket 94 at 220. As part of the agreement, ILCC secured liens on IDC's five trailers and one truck, collectively worth $400,000. *Id.* at 87; Docket 98 at 29, 54. On February 4, 2016, the net proceeds of the loan were deposited into a Wells Fargo account held in IDC's name, but Haynes maintained control over the account. Docket 98 at 43, 134-35, 138; Docket 94 at 9-10. The following day, Haynes and HPM began using the proceeds on purchases unrelated to propane or equipment. Docket 94-1 at 421; Docket 94 at 15, 27, 936-43.

The first disbursement of the loan proceeds was used to provide a loan to Sovereign Business Solutions to support a short-term lending program.[1] Docket 98-1 at 189-90. The next was a $17,676.90 payment to HPM for unspecified "management fees." Docket 94-1 at 421; Docket 94 at 15, 27, 936-43. In total, approximately $426,869.44 of the loan proceeds were paid to Haynes through HPM as "management fees," including at least $237,176.90 paid to HPM within six months after the loan proceeds were first deposited. Docket 94 at 12, 14-15, 27-28. The management fees were often paid in lump sums at irregular intervals and in varying amounts, unrelated to propane sales. *Id.* at 27-28. By contrast, during that same period, IDC only purchased approximately $12,835.42 in propane. *Id.* at 27. By the time the funds were exhausted, Haynes, HPM, and related entities had received over $760,000.00 from ILCC's $1.5 million loan. *Id.* at 13. The management fees that were earned based on each gallon of propane delivered merely totaled "no more than a few thousand dollars." Docket 98-2 at 34.

At trial, Haynes asserted that these payments to HPM were reimbursements for expenses incurred on behalf of IDC. Docket 98-1 at 192, 210. Several HPM invoices labeled these reimbursement payments as "management fees" without providing any additional explanation.[2] Docket 94-1

---

[1] Based on trial testimony, Sovereign Business Solutions was a payday lending business based in Indian country. *See* Docket 98 at 104-05.

[2] At trial, IDC's accountant, Randal Crawford, testified that the paperwork describing the reimbursement payments as "management fees" were not "proper descriptions." Docket 98-1 at 123-25. When asked why the descriptions in his accounting records were improper, Crawford explained that

at 1-6, 203, 218-19, 226-27, 421, 430, 505; *see also* Docket 94 at 936-37.

Haynes also used the loan proceeds to pay expenses unrelated to the propane venture, including some incurred more than a year before the loan was negotiated. *See* Docket 94 at 191-202 (Haynes Investments legal fees from 2014 to 2015 and for December 2015); Docket 94-1 at 751 (personal travel expenses for members of Haynes's family not working for IDC); Docket 98-2 at 50-52, 93-95. This includes using the loan proceeds to pay down pre-existing debt that existed before loan negotiations. Docket 98-2 at 41-44; Docket 94 at 936. Haynes admitted that certain expenses were improperly paid by IDC. Docket 98-2 at 93-95.

Substantial portions of the loan proceeds were also used for payments to individuals and for technology and other expenses ostensibly related to IDC, but not to propane or propane equipment. For instance, IDC's accountant, Randal Crawford, was paid $5,000 per month for purported part-time services, though no time records were maintained.[3] *See* Docket 98-1 at 109-10, 120,

---

"that's the way the previous CPA set them up." *Id.* at 124. He further testified that the payments were, in fact, "transfers," not management fees, and that he did not correct the labeling error because he "was new to the entity [a]nd it took [him] time to adjust." *Id.* at 124-27.

[3] Crawford testified that he worked for IDC approximately 20 to 30 hours per week issuing checks and making entries in QuickBooks. Docket 98-1 at 109, 147-48. When asked why it took him 20 hours to complete 18 and 17 QuickBook entries in January and February 2016, respectively, Randall explained that "there was all kinds of paperwork that went on . . . when the loan first came through." *Id.* at 147-48. Randall testified that IDC was transferring vehicles, titles, and liens "and all that," resulting in a significant amount of paperwork during that period. *Id.* at 148.

147-48; *e.g.,* Docket 94-1 at 97-98. Haynes directed IDC to pay $1,500 per month to Haynes Investments for IDC's rent, and an additional $1,500 per month for HPM's rent. Docket 98-1 at 108, 110, 129-30, 182; Docket 94-1 at 206-07, 212-15, 220-21, 224-25. But IDC's executive director, Gabe Doney, resided in Rapid City, South Dakota—approximately one thousand miles from Dallas—during the relevant period. Docket 98-1 at 28, 33. Haynes was also charging IDC a nominal amount for an "administration and technology fee." *E.g.,* Docket 94-1 at 216-17, 240-41, 247-48, 266, 285.

In May 2016, after Moody's rated IDC's proposed bonds as a significantly risky investment, Brunkow believed IDC would be unable to market the bonds, and that a different form of repayment for the bridge loan was necessary.[4] *See* Docket 98 at 96-97. After learning that the bond rating was poor, Brunkow did not call the note because he believed he had a good working relationship with Haynes and that Haynes would ensure IDC could repay the loan. *Id.* at 97. Haynes told Brunkow that IDC was seeking support from other funding

---

[4] The bond failed because the Wisconsin Public Finance Authority (PFA) chose not to proceed after the Securities and Exchange Commission (SEC) contacted them about the Galanis fraud. Docket 100 at 5. On June 1, 2016, the PFA emailed its attorney an article on Galanis's indictment for stealing the original WLCC bond proceeds, and the attorney also received a call from the SEC about names linked to the case, recognizing only Burnham Securities, the brokerage that placed the original $60 million bonds for WLCC. *Id.* He then informed IDC and the underwriter's attorneys that the PFA would not proceed, allowing IDC to withdraw the application voluntarily. *Id.* at 6. It also became clear that no further annuity payments would be made to IDC from the original $60 million WLCC bonds because the funds had been stolen. *Id.*

sources, but those efforts were unsuccessful.[5] IDC subsequently withdrew its bond request. Docket 98-1 at 47. IDC eventually failed to pay the loan by its original maturity date of August 31, 2017. Docket 98 at 48; Docket 94 at 220. ILCC twice extended the maturity date to allow the business to regain its footing and succeed. Docket 98 at 49-50, 52-53; Docket 94 at 226-28. Although IDC made some interest payments, it ultimately defaulted. Docket 98 at 50, 54, 118, 123; Docket 94 at 867-70. IDC did not surrender any collateral to ILCC, and Brunkow testified that he located two pieces of the collateral at an auction yard in Kentucky, but that he was not able to access the funds from their sale. Docket 98 at 57. Otherwise, no one from IDC was able to confirm the location of the collateral.[6] *Id.* Haynes admitted at trial that the collateral was not fully refurbished. Docket 98-2 at 24-26, 39, 81; Docket 94 at 100. ILCC recovered approximately $329,000 of the loan funds through interest payments. *See* Docket 99 at 16; Docket 98 at 110-11; Docket 98-2 at 30-31; Docket 94 at 29-30, 875.

---

[5] Evidence at trial showed Haynes attempted to obtain financing from Hunting Dog Capital. Docket 98-1 at 50; Docket 94 at 787-88. Haynes testified that he contacted other potential investors, Docket 98-1 at 50, 232-33, but no documentation was introduced at trial to substantiate that claim.

[6] Brunkow stated that he believed the collateral was located on four separate American Indian reservations and that, until 2020, he never attempted to locate the collateral. Docket 98 at 111-12. Haynes testified that, to the best of his knowledge, the collateral "absolutely" existed and that he did not overstate its value to ILCC when deciding whether to make the loan. Docket 98-1 at 233. The record also reflects that, although ILCC held liens on the titles to the trailers and truck used as collateral, IDC sold a truck and trailer to the Spirit Lake Tribe to pay interest on the loan. Docket 98 at 110-11; Docket 94 at 871.

## DISCUSSION

To succeed on a fraud claim under South Dakota law, the plaintiff must prove: (1) the representation at issue was "made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made[,]" (2) the representation was "made with intent to deceive and for the purpose of inducing the other party to act upon it[,]" and (3) "the person to whom the representation [was] made must show that he did in fact rely on it and was induced thereby to act to his injury or damage."[7] *Aqreva, LLC v. Eide Bailly, LLP*, 950 N.W.2d 774, 791 (S.D. 2020) (citation omitted).

Similarly, under South Dakota law, "[o]ne who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." SDCL § 20-10-1. Deceit means one of the following:

> (1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
> (2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;
> (3) The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or
> (4) A promise made without any intention of performing.

SDCL § 20-10-2; *see also Reitz v. Ampro Royalty Trust*, 61 N.W.2d 201, 203 (S.D. 1953) ("A promise relating to a future event may constitute actionable fraud when made without intention of performance."). To prevail on a fraud claim under South Dakota law, a plaintiff must establish each element by a

---

[7] The court previously ruled that South Dakota substantive law applies to this action. *See* Docket 32 at 11.

9

preponderance of the evidence. *Sejnoha v. City of Yankton*, 622 N.W.2d 735, 739 (S.D. 2001). At a bench trial, the court is in a "superior position to determine the witnesses' credibility, and to resolve conflicts in the testimony." *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 739 (8th Cir. 2013) (citation omitted).

ILCC's fraud claims against Haynes and HPM arise from false statements made by Haynes to induce ILCC to fund a $1.5 million loan to IDC. Docket 99 at 8. ILCC makes four main arguments as to how Haynes engaged in fraud and deception. *Id.* at 9-15. First, ILCC argues that Haynes misrepresented the intended use of the loan proceeds. *Id.* at 9-12; Second, ILCC contends that Haynes misrepresented that the bonds were fully subscribed. *Id.* at 12-13. Third, ILCC asserts that Haynes falsely represented the number of tribes that had joined IDC or were imminently expected to join. *Id.* at 13-14. Fourth, ILCC maintains that Haynes misrepresented the value of the collateral. *Id.* at 14-15. ILCC contends that it relied on each misrepresentation to its detriment, which caused it significant harm. *Id.* at 10, 13-15. The court addresses each argument in turn.

## I.    Whether Haynes is Liable for Fraud Because He Made False Representations About the Intended Use of the Loan Proceeds

Haynes provided ILCC with a sources-and-uses document in contemplation of the loan. Docket 98 at 20, 24; Docket 94 at 99-100. In that document, Haynes represented that IDC would use the loan proceeds for specific purposes related to its propane business: (1) loan fees to ILCC; (2) a

10

line of credit for the purchase of propane; (3) a reserve account;[8] and (4) the purchase of storage tanks and delivery vehicles. Docket 94 at 99; Docket 98 at 24-25. Brunkow testified that he received the sources-and-uses document from Haynes. Docket 98 at 24. Although Haynes denied creating the sources-and uses-document during trial, Docket 98-2 at 22-23, he previously testified at his deposition that he created it, *id.* at 23.

The court credits Brunkow's testimony and rejects Haynes's denial. Brunkow's account is consistent with the record, while Haynes's trial testimony is not. Haynes admitted during his deposition that he prepared the sources-and-uses document but denied doing so at trial. *Id.* at 22-23. In another document, Haynes represented that IDC "needs funds to purchase storage tanks, delivery vehicles, and propane," Docket 94 at 664, and Haynes acknowledged under oath during his deposition that he created that document, *see* Docket 98-2 at 26. At trial, Haynes reversed course and denied that too. *See id.* The record shows that Haynes repeatedly changed his story to suit his litigation position. As such, the court finds that, as shown by the greater weight of the evidence, Haynes created the sources-and-uses document.

In light of that finding, the court concludes that the statements in the sources-and-uses document refer to future events because they describe how IDC intended to use the loan proceeds if the loan had been approved. The

---

[8] The $500,000 reserve account was ultimately eliminated because Haynes's intended use for those funds was too risky, leaving only propane purchases and the acquisition of propane storage tanks and delivery vehicles as intended uses of the loan proceeds. *See* Docket 98 at 26-27.

record reveals that Haynes never intended to perform as promised, which makes the statements actionable as fraud under South Dakota law. *See* SDCL § 20-10-2(4). For instance, immediately after receiving the funds, Haynes diverted substantial portions of the loan proceeds to HPM and other entities for purposes unrelated to the propane project, including management fees, personal payments, preexisting debts, and other business ventures. Docket 94-1 at 1-6, 97-98, 203, 206-07, 212-15, 218-21, 224-27, 421, 430, 505, 751; Docket 98-2 at 41-44, 50-52, 93-95; Docket 94 at 191-202, 936-37; *see* Docket 98-1 at 108-10, 120, 129-30, 147-48, 182. The timing and nature of these transactions demonstrate that Haynes knew the statements were untrue at the time they were made or, at a minimum, made them recklessly.

Additionally, the substantial portion of loan proceeds spent on items unrelated to propane or propane equipment further supports the conclusion that Haynes never intended to use the funds for the purposes identified in the sources-and-uses document. In total, approximately $426,869.44 was paid to IDC as purported management fees, Docket 94 at 15—of which $237,176.90 were paid to HPM in the first six months of the funds being dispersed, Docket 94-1 at 1-7, 193, 195-97, 199, 421, 430, 505, 606—while only about $12,835.42 was spent on propane during the same period, Docket 94 at 13 (showing Town and Country purchases). Many of these payments were reimbursements for propane purchases made *prior* to IDC's receiving the loan proceeds. *See id.* at 150-66. Moreover, propane purchases appear to have ceased by spring 2016, just months after the loan proceeds were disbursed.

12

*See* Docket 94-1. By the time the funds were exhausted, Haynes and related entities had received over $760,000 of the $1.5 million loan. Docket 94 at 13 (noting payments to Haynes, HPM, and HIL).

These actions are wholly inconsistent with the stated purposes in the sources-and-uses document and support the inference that Haynes never intended to use the loan proceeds as represented. Haynes's attempt at trial to characterize these payments as reimbursements is unpersuasive, particularly where the invoices labeled them as "management fees" without explanation, Docket 94-1 at 1-6, 203, 218-19, 226-27, 421, 430, 505; *see also* Docket 94 at 936-37, and where Haynes admitted that certain expenses were improperly paid, *see* Docket 98-2 at 93-95. The diversion of funds to pre-existing debts, Docket 98-2 at 41-44, Docket 94 at 936, unrelated expenses, Docket 94 at 191-202, Docket 94-1 at 751, Docket 98-2 at 50-52, 93-95, and payments to affiliated entities, *see* Docket 98-1 at 108-10, 120, 129-30, 147-48, 182; *e.g.*, Docket 94-1 at 97-98, 206-07, 212-15, 220-21, 224-25, further demonstrates that the representations in the sources-and-uses document were not merely inaccurate but were made without a reasonable basis and without intent to perform, *see* SDCL §§ 20-10-1, 20-10-2(4). As such, the court finds that Haynes's representations regarding the intended use of the loan proceeds were false statements of fact or, alternatively, promises made without any intention of performance, satisfying the first element of fraud under South Dakota law.

The record also establishes that Haynes's immediate misapplication of the loan proceeds demonstrates his intent to deceive ILCC. As stated above,

13

within days of the loan disbursement, he diverted substantial portions of the funds to unrelated expenses, including management fees to HPM, preexisting debts, and personal payments, rather than being used for the purposes outlined in the sources-and-uses document. Notably, the use of the loan funds to pay undisclosed expenses that predated the loan and were unrelated to the propane business further demonstrates that Haynes knew his representations regarding the intended use of the funds were false. That the events prescribed in the sources-and-uses document were entirely within Haynes's control further confirms that the statements were untrue and made without any intent to perform.

Moreover, the record shows that ILCC relied on Haynes's representations when it disbursed the $1.5 million loan. The sources-and-uses document was included in the loan package presented to the ILCC board and created the expectation that the funds would be applied to the propane venture as described. Docket 98 at 17-18, 20, 38-39; Docket 94 at 99-100, 800. Largely based on these representations, ILCC provided the loan, only to have the funds misapplied, leaving ILCC with a mostly unrecovered loan and minimal collateral. Brunkow testified that, had he known the loan proceeds would be used for purposes other than those represented, ILCC would not have funded the loan. Docket 98 at 41-42. This conclusion holds true even though Brunkow, ILCC's CEO at the time, was the only witness to testify on this issue, and no member of ILCC's board testified otherwise. In light of his role, Brunkow had the authority and knowledge to speak for ILCC, and the record

14

provides no basis to question his testimony.[9] The court finds that ILCC's reliance on Haynes's statements directly caused its financial loss, satisfying the requirement that the plaintiff was induced to act to its detriment under South Dakota law.

Haynes contends that two statements made by Brunkow undermine ILCC's claim that the sources-and-uses document "was a commitment to use the loan proceeds only for the enumerated purposes." Docket 100 at 10. First, Haynes points to a proposed term sheet in which Brunkow noted that the loan proceeds could be used generally "to fund startup costs of venture while bond rating and sale is pending." *Id.* at 10-11 (quoting Docket 94 at 732). Second, Haynes highlights Brunkow's trial testimony that he understood the funds could be used for operational expenses, including paying Gabe Doney (the only person on IDC's payroll), and covering telephone and internet bills. *Id.* at 10; *see also* Docket 98 at 102.

These assertions, however, do not defeat ILCC's fraud claim. The sources-and-uses document identified specific purposes for the loan proceeds, propane purchases and the purchase of storage tanks and delivery vehicles, and Haynes's choice not to include any other proposed uses in the document further demonstrates that he intentionally cabined the uses to the enumerated list. Brunkow's acknowledgment of some general startup or operational costs

---

[9] During trial, Brunkow testified that when the ILCC board met to consider the proposed loan to Haynes and IDC, he explained the transaction, described the finances of the borrowing entity, and outlined how ILCC would be repaid. Docket 98 at 17, 38-39.

does not negate the core representations in the sources-and-uses document, which were central to ILCC's decision to fund the loan. Under South Dakota law, fraud turns on whether a false statement was made with intent to induce reliance and whether that reliance caused injury. *See Aqreva, LLC*, 950 N.W.2d at 791. Haynes's immediate diversion of funds to unrelated purposes—such as prior expenses, excessive management fees, and minimal purchases of propane—demonstrates that he never intended to follow the sources-and-uses document.

In short, any general flexibility noted by Brunkow during trial does not excuse Haynes's misrepresentations or the false promises in the sources-and-uses document. The evidence shows that Haynes knowingly or recklessly made the representations to induce ILCC to act, and ILCC relied on those representations to its detriment. Haynes's argument therefore fails.

Thus, based on the record and the court's factual findings, Haynes's false representations regarding the intended use of the loan proceeds establish his liability for fraud under South Dakota law.

## II.    Whether Haynes is Liable for Fraud Because He Falsely Represented that the Bonds Were Fully Subscribed

For similar reasons, a preponderance of the evidence shows that Haynes is liable for fraud under South Dakota law because he misrepresented to ILCC that the bonds were fully subscribed. Haynes told Brunkow that the bonds intended to fund IDC's propane project were fully subscribed and would be sold once Moody's issued its rating, *see* Docket 98 at 34, which was memorialized in Brunkow's credit memorandum provided to the ILCC board, *see* Docket 94 at

16

146 (stating that IDC "has indicated that the entire $22,000,000 initial issuance has been subscribed and as such is fully sold upon receipt of the rating from Moody's, mitigating some of the risk normally associated with a public (quasi-public) bond offering"); Docket 98 at 34-35.

The court credits Brunkow's testimony that Haynes made this oral representation to him and rejects Haynes's denial. *See* Docket 98-1 (Haynes denying he made such a representation to Brunkow). Brunkow's account is consistent with the documentary record, including the credit memorandum that he prepared for the ILCC board memorializing the representation that the bonds were fully subscribed. That contemporaneous document reflects the information Brunkow understood Haynes to have provided at the time of the loan transaction.

Haynes's testimony, by contrast, is not credible. As with the sources-and-uses document, Haynes denied making a representation that is corroborated by the record and by Brunkow's testimony. *See supra*, pp. 11. This is not an isolated inconsistency. The record shows that Haynes has altered his testimony when confronted with contrary evidence, including denying statements he previously admitted making under oath. *See* Docket 98-2 at 22-23, 26. Faced with this pattern, the court finds that Haynes's testimony is shaped by his litigation position rather than a reliable account of events.

The record reveals that Haynes knew this representation concerning the bonds being fully subscribed was false at the time he made it. By May 2016, Moody's had issued a poor rating, making clear that the bonds could not be

17

sold as Haynes described. *See* Docket 98 at 96-97. As noted above, Haynes immediately diverted loan proceeds to purposes unrelated to the propane project, including payments for prior expenses and management fees, and propane purchases effectively ceased by spring 2016. *See supra*, pp. 14-16. These facts demonstrate that Haynes made the representation either knowingly or recklessly, without any intent to perform as promised.

The court finds that ILCC relied on Haynes's assertion in approving and funding the loan. The representation was made in direct connection with ILCC's decision to provide IDC a $1.5 million loan, *see* Docket 94 at 144-48 (credit memorandum), and was included in the "Primary Risks" section of the credit memorandum Brunkow prepared for the ILCC board in contemplation of that decision, *id.* at 146. Brunkow further testified that he provided the credit memorandum to the ILCC board to assure the board that repayment was likely, reinforcing its decision to approve the loan. *See* Docket 98 at 31. The record confirms that ILCC suffered financial injury as a result. *See* Docket 99 at 16. The misrepresentation directly contributed to ILCC's loss when the loan proceeds were misused and ILCC partly recovered the collateral.

In light of the evidence, Haynes's statement that the bonds were fully subscribed constitutes a false representation of fact, made knowingly or recklessly, with the intent to induce ILCC to fund the loan. Haynes relied on these statements and suffered damages as a result. Haynes is therefore liable for fraud under South Dakota law.

18

### III.   Whether Haynes is Liable for Fraud Because He Falsely Represented IDC's Membership

The court finds by a preponderance of the evidence that Haynes is liable for fraud under South Dakota law because he falsely represented IDC's membership and the prospect of membership. In a one-page overview provided to ILCC in connection with the loan, Haynes stated that "11 [tribes] signed letters of intent to join [IDC]. Four tribes have already adopted laws and joined, seven more are in process, and none of the 40 have said no." Docket 94 at 664. These statements were intended to convey that IDC had an established and growing customer base. Brunkow testified at trial that he relied on these representations when considering the loan, Docket 98 at 38, and nothing in the record contradicts his account. The court credits Brunkow's testimony and finds it consistent with his well-established credibility at trial.

The record demonstrates that Haynes either knew these representations were untrue or made them recklessly. The evidence shows that IDC had only two formal members at the time the overview document was created, and that the only customer it served was the Wakpamni Lake Community. Docket 98-1 at 12-13, 63 (describing the two members as the Wakpamni Lake Community Propane Company and the Enterprise Rancheria in California); Docket 94 at 856-59; Docket 98-2 at 415. The record contains no evidence that any of the other 11 tribes had signed letters of intent, that 4 had adopted laws and joined, or that 7 more were in the process of joining.

Haynes contends that Doney provided Brunkow with all existing contracts during the loan negotiations, apparently to suggest that ILCC was

aware of the true state of IDC's membership. Docket 100 at 22. This argument fails. The production of whatever contracts existed does not cure or negate Haynes's affirmative misrepresentations regarding membership and prospective membership. Nor does it establish that ILCC knew the representations were false. At most, it shows that limited documentation was provided, which does not contradict the undisputed absence of evidence supporting the specific claims made in the overview. Also, because the status of IDC's membership was within Haynes's knowledge and control, the court finds that he either knew the statements were false or made them with reckless disregard for their truth. The one-page overview conveyed the misleading appearance that IDC had secured widespread participation, which would naturally affect ILCC's evaluation of the loan risk.

Additionally, Haynes made these representations to induce ILCC to act. By portraying IDC as an enterprise with existing and expanding membership, Haynes created the impression that the propane business had a reliable customer base and strong prospects for revenue generation, thereby suggesting that repayment of the loan was likely. These representations were included in the materials provided to the ILCC board and were presented in connection with its decision to approve the loan. Docket 98 at 70. As such, the court finds that Haynes provided this document and made these statements for the purpose of influencing ILCC's decision to fund the loan.

ILCC also relied on Haynes's representations to its detriment. Brunkow testified that these specific statements in the overview document were

important to the ILCC board in determining whether to issue the loan because it gave the board "some assurance that the tribes were going to be interested in buying the propane." *Id.* at 38. The court credits this testimony. Again, given his role as the CEO during the relevant period, Brunkow had the authority and knowledge to speak for ILCC, and nothing in the record undermines his credibility. ILCC approved and funded the loan based, in part, on the understanding that IDC had secured participation from multiple entities and would continue to grow its membership.

Haynes testified at trial that he did not author the document conveying IDC's membership and prospective membership, despite having admitted during his deposition that he created it. Docket 98-1 at 203. Instead, Haynes contends that Brunkow likely drafted the document. Docket 100 at 22-23. Haynes explains that on the morning of January 8, 2016, Brunkow asked him to prepare a brief, two- to three-paragraph description of the project. *Id.* at 22. Because Haynes was traveling, he emailed attorney Tim Anderson and Brunkow, informed Anderson of Brunkow's request, and asked Anderson to respond. *Id.* Shortly thereafter, rather than sending Brunkow a short narrative, Anderson sent him the full version of the 2015 preliminary offering statement for the bond issue, which describes IDC and its mission. *Id.*; Docket 94 at 371-663.

Haynes asserts that the preliminary offering statement circumstantially supports the conclusion that Brunkow drafted the one-page overview detailing IDC's supposed membership. Docket 100 at 23. Haynes asserts that the

21

overview identifies Burnham Securities as the underwriter for the bonds—an error, since Burnham Securities had been terminated by ILCC in November 2015. *Id.* Haynes argues that this is understandable if the drafter had relied on the preliminary offering statement, which still listed Burnham Securities as the initial underwriter. *Id.* Haynes maintains he was aware of Burnham's termination, but Brunkow may not have been. *Id.* Further, Haynes points to Brunkow's trial and deposition testimony, in which he professed no knowledge of who authored the one-page overview or when it was created. *Id.* (citing Docket 98 at 70-72). Haynes contends that it's reasonable to conclude that Brunkow sent the overview that he created to the ILCC board as part of the loan package and then, under oath, claim ignorance about its authorship. *Id.* According to Haynes, this explains why it was most likely Brunkow, and not Haynes, who drafted the one-page overview misrepresenting IDC's membership. *Id.*

The court finds Haynes's testimony not credible, and as such, finds his theory unpersuasive. Although his explanation is facially plausible, it is directly contradicted by his prior deposition testimony, in which he admitted to creating the document. *See* Docket 98-1 at 203. This inconsistency, together with the court's broader finding that Haynes's testimony lacks credibility, *see supra*, pp. 11, 17, leads the court to reject his account here as well.

Further, Haynes's alternative theory that Brunkow drafted the document is not supported by the record. The document bears Haynes's name and signature, signifying his adoption and authorization of its contents. Haynes

22

controlled the company and was responsible for the representations made on its behalf in connection with the loan. His attempt to attribute authorship to Brunkow, who professed ignorance during trial about the document's authorship, does not overcome the evidence that the statements were made in Haynes's name and with his apparent approval.

Nor does Haynes's reliance on the preliminary offering statement for the bond meaningfully support his theory. His argument that the reference to Burnham Securities reflects an error derived from that earlier document is speculative. Even if the mistake could be explained in that manner, it does not establish that Brunkow drafted the document or relieve Haynes of responsibility for the representations it contains.

Taken together, the inconsistencies in Haynes's testimony and the lack of evidentiary support for his alternative explanation further demonstrate that his account is driven by his litigation position rather than the facts. The court therefore credits the documentary record and Brunkow's testimony and finds that Haynes is responsible for the statements regarding IDC's membership and prospective membership.

In light of the evidence, Haynes's statements regarding IDC's membership and the prospect of additional members constitute false representations of fact, made knowingly or recklessly, with the intent to induce ILCC to fund the loan. ILCC relied on those representations to its detriment and suffered damages. Haynes is therefore liable for fraud under South Dakota law on this basis.

**IV.    Whether Haynes is Liable for Fraud Based on Inflated Collateral Values**

The court finds that ILCC cannot establish a claim for fraud based on the value or condition of the collateral. South Dakota law requires proof that a misrepresentation was made with intent to induce the plaintiff to act and that the plaintiff relied on that misrepresentation to its detriment. *See Aqreva, LLC*, 950 N.W.2d at 791. Here, ILCC cannot prove fraud because the record is devoid of evidence that it was unaware of the collateral's condition or that the values represented something materially different from the actual state of the assets. *See* Docket 98 at 7-126 (Brunkow's trial testimony).

The evidence introduced at trial, including Brunkow's testimony, fails to establish that ILCC relied on any misrepresentation regarding the collateral's value or condition. At trial, although contrary to his deposition testimony, Haynes admitted that the collateral values provided to ILCC reflected their non-refurbished conditions. Docket 98-2 at 25. But Brunkow never testified whether, during loan negotiations, he knew that the collateral values reflected their non-refurbished conditions, what refurbishment had already been completed, or what work remained to be completed on the collateral. *See* Docket 98 at 7-126. And no other evidence was introduced indicating as much. Consequently, the record contains no evidence that ILCC was misled about the collateral's value or that Haynes intended to induce ILCC to fund the loan based on a materially false impression regarding the value of the collateral.

Thus, the court finds that ILCC failed to carry its burden to prove that Haynes committed fraud by misrepresenting the value of the collateral.

24

## V.    Damages

### A.    Compensatory Damages

Having found that Haynes and HPM are liable for fraud based upon misrepresentations concerning IDC's use of the loan proceeds, IDC's membership, and Haynes's statement that the bonds were fully subscribed, the court now turns to the issue of damages.

"The sole object of compensatory damages is to make the injured party whole." *Hulstein v. Meilman Food Indus., Inc.*, 293 N.W.2d 889, 891 (S.D. 1980). Consistent with this principle, a plaintiff must establish that its damages were the natural and proximate result of the defendant's fraud. Here, the record demonstrates that Haynes's and HPM's fraudulent conduct caused ILCC's financial injury. But for these misrepresentations, ILCC would not have approved or disbursed the loan. Instead, the loan proceeds were diverted to unearned management fees, consultants, and other expenses unrelated to the intended purpose of the loan, leaving IDC without the means to satisfy its obligations to ILCC.

$1.35 million of the $1.5 million loan was disbursed to IDC's account, which was under Haynes's control. *See* Docket 98 at 133. ILCC acknowledges that it retained $150,000 as a loan origination fee. Docket 99 at 16. The record further reflects that ILCC received certain payments on behalf of IDC, including payments characterized as interest in exchange for extensions. *See* Docket 94 at 29-30, 875-76; Docket 99 at 16. After accounting for these amounts, ILCC

has not recovered $1,020,750 of the $1,350,000 disbursed to IDC. *See* Docket 99 at 16.

The court finds that this unrecovered amount constitutes ILCC's actual damages. These losses were the direct and foreseeable result of Haynes's fraudulent inducement, which caused ILCC to extend funds it otherwise would not have provided. Although ILCC failed to carry its burden on its claim that Haynes misrepresented the value of the collateral, the damages awarded here reflect ILCC's losses that are attributable to the misrepresentations the court has found actionable. As such, ILCC is entitled to recover compensatory damages in the amount of $1,020,750.

## B.     Punitive Damages

### 1.     Whether Punitive Damages are Warranted

The court next considers whether punitive damages are warranted.[10] Under South Dakota law, punitive damages may be awarded in "any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed." *Levene v. Staples Oil Co., Inc.*, 685 F. Supp. 3d 791, 798 (D.S.D. 2023) (internal quotation marks omitted). "Actual malice is a positive state of mind, evidenced by the

---

[10] Under SDCL § 21-1-4.1, before submitting a punitive damages claim to the finder of fact, the court must hold a hearing to determine whether the record establishes, by clear and convincing evidence, that that there is a reasonable basis to believe that there has been willful, wanton, or malicious conduct on the part of the defendant. *See* SDCL § 21-1-4.1. Because SDCL § 21-1-4.1 is procedural and not substantive, however, it is not applicable to federal courts sitting in diversity, such as this court. *See Ammann v. Massey-Ferguson, Ltd.*, 933 F. Supp. 840, 843-44 (D.S.D. 1996).

positive desire and intention to injure another, actuated by hatred or ill-will towards that person." *Id.* at 799 (internal quotation marks omitted).

ILCC appears to concede that the record is devoid of evidence that Haynes and HPM acted with actual malice. *See* Docket 99 at 15-17 (arguing only that defendants acted with presumed malice). Without evidence of actual malice, the court will permit punitive damages only if the record shows by a preponderance of the evidence that defendants' conduct supports an inference of malice. *Levene*, 685 F. Supp. 3d at 799; *Flockhart v. Wyant*, 467 N.W.2d 473, 475 (S.D. 1991) (establishing that a preponderance of the evidence standard is required to prove punitive damages). Presumed, legal malice may be inferred where the defendant acts willfully or wantonly to the injury of another. *Levene*, 685 F. Supp. 3d at 799. "Willful and wanton misconduct is behavior that demonstrates the defendant consciously realized that his conduct would in all probability, as distinguished from possibility, produce the precise result which it did produce and would bring harm to the plaintiff." *Id.* (citation omitted). Malice cannot be presumed by "simply the doing of an unlawful or injurious act," but rather from acts that are "conceived in the spirit of mischief or of criminal indifference to civil obligations." *Dahl v. Sittner*, 474 N.W.2d 897, 900 (S.D. 1991) (quoting *Hannahs v. Noah*, 158 N.W.2d 678, 682 (S.D. 1968)). "A claim for presumed malice can be shown by demonstrating a disregard for the rights of others." *Levene*, 685 F. Supp. 3d at 799. The court applies an objective, not subjective, standard in assessing willful or wanton conduct. *Id.*

The court finds that Haynes and HPM acted with willful and wanton disregard for ILCC's rights. As set forth above, Haynes made multiple material misrepresentations to induce ILCC to fund the loan, including false statements regarding IDC's membership, the subscription status of the bonds, and the intended use of the loan proceeds. These were not isolated inaccuracies but part of a broader pattern of conduct designed to present the venture as more stable and financially secure than it actually was.

Haynes's conduct following the disbursement of funds reinforces this conclusion. Rather than use the loan proceeds for the represented propane project, Haynes diverted substantial amounts to unearned management fees, consultants, and other unrelated expenses. This misuse of funds demonstrates that Haynes acted with a conscious disregard for ILCC's financial interests and the foreseeable consequences of his actions.

The record further supports a finding of willful and wanton misconduct based on the foreseeability of the harm resulting from Haynes's conduct. The evidence suggests that Haynes proceeded under the assumption that any diversion of loan proceeds would ultimately be of no consequence because the anticipated bond issuance would generate sufficient funds to repay ILCC. But that assumption does not excuse his conduct. It was reasonably foreseeable that the bond issuance might not succeed as planned, including the possibility that Moody's would assign an unfavorable rating that would impair or prevent the sale of the bonds. When that foreseeable risk materialized, Haynes's decision to divert the loan proceeds left IDC without the means to satisfy its

obligations to ILCC. Under these circumstances, Haynes consciously disregarded a known and substantial risk of financial harm. The more foreseeable the specific risk, the more readily malice may be presumed, and the court finds that this standard is met here. *See Levene,* 685 F. Supp. 3d at 800 (collecting cases).[11]

Taken together, this evidence establishes by a preponderance of the evidence that Haynes's conduct was willful and wanton and supports an inference of presumed malice. His actions reflect not mere negligence or poor judgment, but a conscious decision to proceed in the face of a known and substantial risk that ILCC would suffer financial harm.

The court also finds that HPM is liable for punitive damages. Haynes acted as the principal decisionmaker and agent of the company in negotiating the loan, making the misrepresentations, and directing the use of the loan proceeds. His conduct is therefore properly imputed to HPM, and the company is responsible for the resulting harm.

Thus, the court concludes that punitive damages are warranted to punish defendants' misconduct and to deter similar conduct in the future. The court now turns to determining the appropriate amount of punitive damages.

---

[11] Although defendants argue that the bond issuance failed due to Galanis's fraud, Docket 100 at 5-6, the court finds that the potential for third-party interference or misconduct was a reasonably foreseeable risk in the context of a complex financial transaction. Haynes's decision to proceed on the assumption that the bond issuance would succeed, and to divert loan proceeds in reliance on that assumption, does not insulate him from liability. To the contrary, it underscores that he consciously disregarded the risk that the financing could fail for any number of reasons, including misconduct by others, leaving ILCC exposed to loss.

### 2.    What Amount Should Be Awarded?

In determining the appropriate amount of punitive damages, courts are guided by constitutional limitations articulated by the United States Supreme Court, including the factors set forth in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), and *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003). These guideposts are: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio between punitive and compensatory damages; and (3) a comparison between the punitive damages awarded and civil penalties authorized or imposed in comparable cases. *See Gore*, 517 U.S. at 575-583. In addition, the South Dakota Supreme Court "has identified five factors as having a bearing upon the amount of punitive damages." *Flockhart*, 467 N.W.2d at 479. "These factors are: (1) the amount allowed in compensatory damages; (2) the nature and enormity of the wrong; (3) the intent of the wrongdoer; (4) the wrongdoer's financial condition; and (5) all of the circumstances attendant to the wrongdoer's actions." *Id.*

The South Dakota Supreme Court has stated that "[p]unitive damages must not be oppressive or so large as to shock the sense of fair-minded people, but they may considerably exceed compensatory damages." *Id.* And punitive damages must be substantial to effectively punish the wrongdoer and deter similar misconduct. *Id.*

Applying these standards, the court finds that Haynes's and HPM's conduct was highly reprehensible. The fraud involved intentional misrepresentations concerning IDC's use of loan proceeds, the status of its

30

membership, and the subscription of the bonds, all designed to induce ILCC to provide a $1.5 million loan. Once the loan proceeds were disbursed, Haynes diverted substantial amounts to unearned management fees, consultants, and other unrelated expenses, while IDC's intended propane project received only a fraction of the funds. This was not an isolated or negligent act, but a sustained pattern of deception and conscious disregard for the foreseeable harm to ILCC.

The compensatory damages in this case total $1,020,750. Considering the degree of reprehensibility, the intent to benefit personally at ILCC's expense, and the need for deterrence, the court concludes that a punitive damages award of $250,000 is appropriate. Although the court typically considers the defendants' financial condition, the plaintiffs presented no such evidence and cite none on the record. Although the punitive damages award is less than the compensatory damages, it is still sufficient to punish defendants and deter similar misconduct, while remaining well within constitutional bounds.

In light of the nature and enormity of the wrongdoing, the deliberate intent, and the circumstances surrounding the misappropriation of loan proceeds, this amount strikes a proper balance between punishment and fairness. As such, the court awards $250,000 in punitive damages against Haynes and HPM jointly and severally.

## CONCLUSION

While ILCC failed to carry its burden concerning its claim that Haynes fraudulently inflated the value of the collateral, ILCC did carry its burden

demonstrating a consistent pattern of misrepresentations in other aspects of the transaction. Haynes knowingly or recklessly misrepresented the intended use of the loan proceeds, overstated IDC's membership, and misrepresented the subscription status of the bonds. These actions collectively created the impression that the propane venture was more stable, well-supported, and financially secure than it actually was. This pattern of conduct underscores Haynes's intent to induce ILCC to act and supports liability for fraud with respect to those misrepresentations, even though the collateral claim does not succeed. ILCC is entitled to a compensatory damages award of $1,020,750. Punitive damages are also awarded in the amount of $250,000. Thus, it is

1) ORDERED that Haynes and HPM are liable for fraud under South Dakota law. Judgment will be entered in favor of ILCC. It is

2) FURTHER ORDERED that ILCC is entitled to an award of compensatory damages from Haynes and HPM in the amount of $1,020,750, jointly and severally. It is

3) FURTHER ORDERED that ILCC is entitled to an award of punitive damages from Haynes and HPM in the amount of $250,000, jointly and severally.

Dated March 31, 2026.

BY THE COURT:

/s/ Karen E. Schreier
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

32